# IN THE COURT OF APPEALS OF IOWA

No. 19-0843
Filed June 3, 2020

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**ROBERT PAUL MAHONEY,**
　　Defendant-Appellant.
_____


Appeal from the Iowa District Court for Woodbury County, Patrick H. Tott, Judge.


Robert Mahoney appeals his convictions of first-degree arson and involuntary manslaughter. **AFFIRMED.**


Jared R. Weber, Orange City, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.


Considered by Vaitheswaran, P.J., and Doyle and May, JJ.

**MAY, Judge.**

Robert Mahoney used bug spray and a lighter "like a blow torch" to burn combustibles in his apartment. The fire spread. Two of his neighbors had to go to the hospital. One of them died. A jury convicted Mahoney of first-degree arson and involuntary manslaughter. On appeal, he argues his convictions were not supported by sufficient evidence. We affirm.

**I. Background Facts and Proceedings**

In the early morning hours of February 4, 2018, Sioux City emergency responders were dispatched to a fire at a two-story multifamily apartment complex. The fire had originated in apartment 107 on the first floor. Mahoney lived in apartment 107.

The Sioux City Fire Department extinguished the fire. Two victims were found unconscious in the apartment complex. They were transported to the hospital. One victim, who had lived in apartment 109, died about a month later. The death was ruled a homicide.

Sioux City Police Officer Jeffrey Demetri was among the responders. He noticed Mahoney standing across the street from the apartment complex. Officer Demetri recognized Mahoney from a welfare check hours before the fire.[1] Officer Demetri approached Mahoney and asked him what happened. Mahoney said that he had been playing with bug spray and lighter fluid in an attempt to light papers

---

[1] Mahoney had called 911 to report people were trying to break into his apartment. Police were dispatched to his apartment. But Mahoney refused to let police in and refused to be taken to the hospital for a psychological evaluation.

on fire. The fire got out of control, Mahoney said. Officer Demetri put Mahoney in a police car. Another officer took him to the station.

At the station, Officer Zach Lewis interviewed Mahoney. Lewis summarized Mahoney's story this way:

> He says that he had used meth two days prior and he's been drinking the entire day. We go into specifics of what he was drinking. He uses a hand gesture and says a bottle of Fireball, which is cinnamon whiskey, and then constantly drinking beer throughout the day. He has a friend over . . . . [The friend] is sleeping. And he is drinking beer just so he can go to sleep. And he gets bored so he starts playing with a lighter and bug spray and starts using it like a blow torch. That would bring on that enjoyment and then he started lighting papers on fire. He would spray the paper and light it. It would go out so he would spray and spray, and he'd get frustrated because the fire wasn't going how he wanted so he'd spray and spray and spray.
>
> And he had a table, a round table I would approximate four feet wide, with—full of papers, clothes, everything around the table, and he sprayed and sprayed and sprayed, in his words, to saturate the area, and lit it again. And when it got lit to his satisfaction, as he stated, it was going, he turned around to get some water to put on it, and by the time he turned back around it was out of control so he went to the hallway to get a fire extinguisher. He couldn't get into the holder, took him a while, so he broke into that. Went back in the apartment. Attempted to use a fire extinguisher. Said he didn't know—hadn't used it before, didn't know that you have to pull the pin out. He said he finally got them out and it sprayed. He stated that he got a blow-back in the face, and it was out of control so he started yelling up and down the hall, fire, fire, fire, get out, and he fled the apartment building.

Despite Mahoney's claim of drinking "the entire day" of the fire, Officer Lewis observed no signs—such as odor—that Mahoney had used alcohol. So Officer Lewis had another officer administer a preliminary breath test (PBT). It showed "all zeros," meaning "there was not any alcohol whatsoever in his system."

The State charged Mahoney with first-degree arson, in violation of Iowa Code sections 712.1 and 712.2 (2018), and involuntary manslaughter, in violation

of Iowa Code section 707.5(1)(a). The case proceeded to jury trial. The State presented several witnesses, including Officers Demetri and Lewis.

Mahoney presented the testimony of Dr. Alan Goldstein, a psychologist. Dr. Goldstein opined Mahoney suffered from hallucinations on the night of the fire. In Dr. Goldstein's view, Mahoney set the fire to protect himself from imaginary "demons."

In rebuttal, the State called a psychiatrist, Dr. Arnold Anderson. He offered these observations:

> Essentially there are two competing narratives going on. The first narrative was told [by Mahoney] around the time of the event when the police arrived [and when Mahoney said], as summarized by [counsel], I was bored, I set a fire, I got angry, I set a bigger fire, I recognized the danger, I was unbored and angry and then I left.
> The narrative five days later with Dr. Goldstein, and one which he also shared with me, was that he was embarrassed about telling the police that he believed aliens were about to break in and he set the fire to be a ring of fire preventing the aliens from coming in.
> I found the second narrative of the ring of fire to prevent the aliens coming in as less credible than the first one of a willful, unwise, impulsive act. When people have delusions, they're not embarrassed about them, they believe they're true. And so you don't say I have the belief that the aliens are trying to come in through the window and it's I feel awkward. No. You say it with full belief because by definition a delusion is fixed and false.

Despite their differences, Dr. Goldstein and Dr. Anderson agreed that Mahoney suffered from antisocial personality disorder, "a pervasive pattern of disregard for and in violation of the rights of others." The jury also learned: "Individuals with antisocial personality disorder fail to conform to social norms with respect to lawful behavior. They repeatedly perform acts that are grounds for arrest such as destroying property, harassing others, stealing, or pursuing illegal occupations."

The jury found Mahoney guilty of first-degree arson and involuntary manslaughter. Mahoney now appeals.

## II. Analysis

> We review a sufficiency-of-evidence claim for errors at law. The court considers all the evidence presented at trial and views the evidence in the light most favorable to the [S]tate. The verdict is supported by substantial evidence when the evidence could convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.

*State v. Copenhaver*, 844 N.W.2d 442, 449 (Iowa 2014) (citations omitted). We consider "[d]irect and circumstantial evidence" to be "equally probative." *State v. Huser*, 894 N.W.2d 472, 491 (Iowa 2017).

### A. First-Degree Arson

Mahoney's argument begins with a question of statutory interpretation. Our supreme court, he notes, "has not addressed whether Iowa's arson statute, Iowa Code § 712.1, is a general intent or specific intent crime." Mahoney then argues at length that Iowa courts "should find that the arson" under section 712.1 "is a specific intent crime." And, "[u]pon a finding that the Iowa arson statute requires specific intent," Mahoney argues, this court should also find "there is insufficient evidence to support" an arson conviction.

We disagree. We note initially that the marshalling instruction did not require the jury to find specific intent. Rather, the instruction allowed two options: The jury could return a guilty verdict if Mahoney *either* "specifically intended to destroy or damage the property" *or merely* "knew the property would probably be

destroyed or damaged." This tracks the text of Iowa Code section 712.1(1), in which our legislature defined arson to mean:

> Causing a fire or explosion, or placing any burning or combustible material, or any incendiary or explosive device or material, in or near any property *with the intent to destroy or damage such property,* **or** *with the knowledge that such property will probably be destroyed or damaged*, is arson, whether or not any such property is actually destroyed or damaged.

(Emphasis added).

Because we see no material difference between the instruction and the words of the statute, we conclude the instruction correctly stated the law. And whether the instruction was correct or not, Mahoney did not object to it. So it is "law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes,* 910 N.W.2d 634, 639 (Iowa Ct. App. 2018); s*ee also Crow v. Simpson*, 871 N.W.2d 98, 102 n.1 (Iowa 2015) ("Simpson did not object to the instruction; therefore, it became the law of the case for purposes of our review of the record for sufficiency of the evidence."); *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) ("Canal did not object to the instructions given to the jury at trial. Therefore, the jury instructions become the law of the case for purposes of our review of the record for sufficiency of the evidence."); *State v. Miller*, 874 N.W.2d 659, 663 (Iowa Ct. App. 2015) ("An instruction given without objection is the law of the case for purposes of our review as to the sufficiency of the evidence.").

Nevertheless, we have considered Mahoney's contention that the evidence would not support a finding of specific intent. We conclude otherwise.

As the jury instructions explained, specific intent means "not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific

purpose in mind." The instructions further explained that "[b]ecause determining the defendant's specific intent requires" a decision about what the defendant "was thinking when an act was done," specific intent "is seldom capable of direct proof." *See State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999). So the jury was instructed to "consider the facts and circumstances surrounding the act to determine the defendant's specific intent." *See id.* This required the jury to "make deductions" from the evidence and "reach conclusions according to reason and common sense."[2] *See State v. Mallory*, No. 09-1549, 2010 WL 4484349, at *2 (Iowa Ct. App. Nov. 10, 2010) (noting "the jury [was] presumed to have followed" an instruction with identical wording). Among other things, the jury could "conclude a person intends the natural results of his acts."

Mahoney told police that he used a lighter and bug spray "like a blow torch" to repeatedly ignite combustibles inside his apartment. When the fire did not meet his satisfaction, he "sprayed and sprayed and sprayed" the bug spray to "saturate" the combustibles—and then he lit the fire again. He did all of this inside his apartment. Many children—and most adults—would understand the natural result of these actions: a fire that would damage the apartment building. *See, e.g.*, *State v. Perry*, No. 15-1949, 2017 WL 936092, at *2 (Iowa Ct. App. Mar. 8, 2017) (noting "that, given the nature in which fire spreads, those who commit arson endanger more than the immediate area in which the fire is set"). And according to

---

[2] This sentence is found in instruction number eleven. The same instruction explained direct and circumstantial evidence but noted "[t]he law makes no distinction between direct . . . and circumstantial evidence." Rather, the instruction told the jury to "[g]ive all the evidence the weight and value you think it is entitled to receive."

Mahoney's own psychologist, Mahoney is "very intelligent" with an overall IQ of 120. "[O]nly [nine] percent" of the general population would score higher than Mahoney, Dr. Goldstein testified. On top of that, Mahoney told Officer Lewis that he "used to fight forest fires in California" so "he knows about fire." From all this, the jury could comfortably conclude Mahoney understood and "intend[ed] the natural results of his acts," namely, a fire that would damage the building. This fits well with Dr. Goldstein's observations about antisocial personality disorder:

> Q. . . . . Individuals with antisocial personality disorder fail to conform to social norms with respect to lawful behavior. They repeatedly perform acts that are grounds for arrest such as *destroying property*, harassing others, stealing, or pursuing illegal occupations. *And you would agree that Mr. Mahoney falls within that category?* A. *Most definitely.*

(Emphasis added.)

We have considered Mahoney's argument that, because of his delusions, psychotic history, methamphetamine use, and alcohol consumption, "he did not have the capacity to form specific intent." These were issues for the jury to consider. *See State v. Collins*, 305 N.W.2d 434, 437 (Iowa 1981).

The jury was instructed as follows:[3]

## INSTRUCTION NO. 26
### INTOXICATION AS A DEFENSE

Evidence has been presented to suggest that the defendant was under the influence of intoxicants and/or drugs at the time of the alleged crime. The fact that a person is under the influence of intoxicants and/or drugs does not excuse nor aggravate his guilt.

Even if a person is under the influence of an intoxicant and/or drug, he is responsible for his act if he had sufficient mental capacity to form the specific intent necessary to the crime charged or had the specific intent before he fell under the influence of the intoxicant and/or drug and then committed the act. Intoxication is a defense only when it causes a mental disability which makes the person incapable of forming the specific intent.

## INSTRUCTION NO. 27
### DIMINISHED CAPACITY AS A DEFENSE

One of the elements the State must prove is that the defendant acted with specific intent. The lack of mental capacity to form a specific intent is known as "diminished capacity".

Evidence of "diminished capacity" is permitted only as it bears "on his capacity to form specific intent.

"Diminished capacity does not mean the defendant was insane. A person may be sane and still not have the mental capacity to form an intent because of a mental disease or disorder.

The defendant does not have to prove "diminished capacity"; rather, the burden is on the State to prove the defendant was able to, and did, form the specific intent required.

---

[3] But we note "[e]vidence of diminished responsibility may not, however, negate general criminal intent, and is therefore not a defense to crimes which do not require proof of specific intent." *Anfinson v. State*, 758 N.W.2d 496, 502 (Iowa 2008). As noted, an arsonist must either "inten[d] to destroy or damage . . . property" or "know[] that such property will probably be destroyed or damaged." Iowa Code § 712.1(1). The diminished-responsibility defense could only apply to the first alternative. *See State v. Young*, No. 17-0749, 2018 WL 1182553, at *3 (Iowa Ct. App. Mar. 7, 2018) (noting "[t]he defense of diminished responsibility is only available to specific intent crimes and may not serve to negate an element requiring knowledge" so "Young's defense . . . would not benefit her relative to the second alternative of arson").

But neither these instructions, nor any others, required the jury to accept Mahoney's claims that "intoxication" or "mental disease or disorder" prevented him from forming specific intent. Rather, when fulfilling their duty to decide the facts of the case, the jury was free to accept or reject any evidence presented. For example, the jury could have accepted the opinion of Dr. Anderson that Mahoney "had the capacity to form specific intent at the time of the fire that was set."

Moreover, using their reason and common sense, the jury could have concluded Mahoney's claims of intoxication and delusions were simply not true. For example, on the night of the fire, Mahoney tried to convince Officer Lewis that he had been drinking all day. But Lewis smelled no alcohol on him. And Mahoney's breath test showed "all zeros," meaning "there was not any alcohol whatsoever in his system." So the jury could have inferred the drinking-binge did not happen.

Similarly, days after the fire, Mahoney tried to convince Dr. Goldstein and Dr. Anderson that his real reason for setting the fire was to protect himself from imaginary demons or aliens. But, like Dr. Anderson, the jury could have rejected this narrative because Mahoney did not mention demons, aliens, or other delusions when he talked to police immediately after the fire.

Instead, Mahoney's explanation on the night of the fire showed a clear pattern of rational (albeit deeply misguided) behavior. He told police he started the fire for a reason—because he was bored. He expanded the fire for another reason—because he was angry. He used a lighter and bug spray—together—to grow the fire. When he decided to control the fire, he sought water. Then he sought a fire extinguisher. Then, when he got scared, he warned other occupants

of the building. Then he fled to safety. None of these actions suggest he was too drunk or too delusional to form rational plans or act on them. Instead, these actions showcase Mahoney's capacity for purpose-driven behavior. They show he repeatedly acted with "specific intent," that is, "with a specific purpose in mind."

Viewing the evidence in the light most favorable to the State, we find ample evidence to support a finding that Mahoney specifically intended the natural results of his actions, namely, a fire that damaged the apartment building in which Mahoney had started a fire. We affirm his arson conviction.

### B. Involuntary Manslaughter

Mahoney also contends there was insufficient evidence to prove involuntary manslaughter. He argues his conduct was neither reckless nor the proximate cause of the victim's death. As the State points out, though, Mahoney did not preserve error on the recklessness claim because he only raised the causation issue in his motion for judgment of acquittal. *See State v. Hoon*, No. 11-0459, 2012 WL 836698, at *3 n.3 (Iowa Ct. App. Mar. 14, 2012) ("The defendant's motion for judgment of acquittal discussed the causation issue, but did not challenge the State's proof of recklessness. To preserve error, ordinarily the defense motion must identify the specific grounds raised on appeal."). So we only address the causation issue.

Because no objection was made to the causation instruction, it became "the law of the case for the purposes of our review of the record for sufficiency of the evidence." *Canal*, 773 N.W.2d at 530. The instruction stated, "The conduct of a party is a cause of death when the death *would not have happened* except for the conduct." (Emphasis added). *See State v. Tribble*, 790 N.W.2d 121, 127–28 (Iowa

2010) ("When causation does surface as an issue in a criminal case, our law normally requires us to consider if the criminal act was the factual cause of the harm. The conduct of a defendant is a 'factual cause of harm when the harm would not have occurred absent the conduct.'" (citations omitted)). Therefore, we use this standard when reviewing causation.[4]

Here, the victim was found unconscious in the apartment building and then transported to the hospital. The victim was treated at the hospital for injuries resulting from smoke inhalation. She was discharged to a nursing facility on February 22, 2018. Unfortunately, the victim passed away on February 27.

Iowa State Medical Examiner Dr. Dennis Klein performed the autopsy and testified about his findings at trial. He determined the cause of death was "[b]ilateral pulmonary emboli due to bilateral deep venous thromboses." In other words, Dr. Klein testified, the victim had blood clots form in both legs and "[t]hese blood clots broke up and they went to both lungs" causing the victim to die. And his report[5] explained that, because "the decedent was mobile and active prior to smoke inhalation injury and then experienced decreased mobility (a significant risk factor for development of deep venous thromboses) and weakness following the smoke inhalation incident, the smoke inhalation was a significant contributory factor to the cause of death." So Dr. Klein classified the manner of death as homicide.

---

[4] To the extent that Mahoney is suggesting the wrong standard of causation was used, we would find error was not preserved. Defense counsel had no objection to the inclusion of the causation instruction. *See State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011) ("The doctrine of error preservation has two components— a substantive component and a timeliness component.").

[5] Dr. Klein's autopsy report was received as exhibit 8.

Based on this evidence, a reasonable jury could find the victim would not have died "except for" Mahoney starting the fire.

## III. Conclusion

We affirm Mahoney's convictions.

**AFFIRMED.**